## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

**J.C.** *individually and on behalf of J.C., a*      :
*minor,*                                              :
                                                      :
       v.                                             :        **CIVIL ACTION NO. 20-5030**
                                                      :
**UPPER DARBY SCHOOL DISTRICT**                       :

---

**MCHUGH, J.**                                                    **November 29, 2022**

### <u>MEMORANDUM</u>

  This is an appeal under the Individuals with Disabilities Education Act ("IDEA"). The student whose rights are at issue, referred to here by his initials J.C., has serious difficulties hearing, which his doctors have addressed with cochlear implants. Though highly effective, such implants can be uncomfortable for a young child, and J.C has responded by frequently removing them. This in turn has led to difficulties in his hearing and understanding, sparking a frustration on his part that has contributed to both educational and behavioral issues. Upper Darby School District considered multiple placements to address these concerns, finally settling on an autism-support classroom where close supervision is the norm. His mother is understandably concerned about such a placement, as J.C. does not have a diagnosis of autism. She filed a due process complaint, claiming both failure to provide J.C. with a free appropriate public education ("FAPE") and failure to address his needs in the least restrictive environment ("LRE"). A Hearing Officer found no violation of the IDEA, a ruling J.C.'s mother now appeals. The Hearing Officer also directed the parties to "meet to revisit Student's strengths and needs prior to the start of the 2020-

21 school year and make any necessary revisions" to the student's plan.  H.O. at 31.[1]  After closely

reviewing a substantial record, I must concur with the Hearing Officer and conclude that the Upper

Darby School District did provide J.C. with a FAPE and based on the evidence did so in the least

restrictive alternative.   I further conclude that the Upper Darby School District adequately

complied with the Hearing Officer's Order.   Consequently, despite my admiration for the

determination shown by J.C.'s mother to provide her son with the best possible education, I am

constrained to deny Plaintiffs' Motion for Judgment on the Administrative Record.

### I.      Relevant Background

This case concerns the Upper Darby School District's educational programming for student

J.C.  As is typical in Individuals with Disabilities Education Act (IDEA) cases, the factual record

must be closely reviewed.[2]  I find the following to be reliably established by the record.  J.C. is a

primary elementary school-aged student in the Upper Darby School District.  J.C. is eligible for

special education pursuant to the IDEA based on the classifications of Hearing Impairment and

Other Health Impairment. H.O. at 4; S-69 at 44.  J.C. has bilateral hearing loss and has had bilateral

cochlear implants since before the age of three.  H.O. at 4; P-2 at 8; S-6 at 6-7.  Since at least early

2019, J.C. has occasionally removed the implant processors when frustrated.  H.O. at 4; N.T. at

242, 530, 687-88; S-6 at 7, 13.   Without these processors, J.C. is deaf.   S-69 at 44.   J.C. has

historically needed a highly structured learning environment that emphasizes language and hearing

support.  H.O. at 4; P-9 at 21; P-15 at 39.

---

[1] Throughout this Memorandum, the Hearing Officer's Decision and Order is cited to as "H.O."; the Due
Process Hearing transcript is cited to as "N.T."; Plaintiffs' exhibits in the administrative record are cited to
as "P"; the School District's exhibits in the administrative record are cited to as "S"; and the supplemental
record is cited to as "S.R."

[2] This case was reassigned on July 25, 2022, upon the retirement of the Honorable Petrese Tucker.

### A.  Pre-kindergarten placement

In 2018, J.C. attended preschool at the Pennsylvania School of the Deaf for what could have been J.C.'s kindergarten year.  H.O. at 4; S-6 at 4; S-69 at 1.  In the summer of 2019, J.C. transitioned from the private school placement to a full-day Delaware County Intermediate Unit ["DCIU"] program that J.C. had previously attended, which was considered a diagnostic placement. H.O. at 5; N.T. at 63-65, 75, 182-83, 799; S-6 at 4; S-17 at 7.  The program was located at the Marple Education Center, a DCIU building that educates about 125 children, none of whom are typically developing.  H.O. at 5; N.T. at 132-33, 201-03, 260, 341-42, 346-47, 358, 360; S-17 at 44.

The DCIU conducted an evaluation of J.C. in February 2019.  H.O. at 4-5; S-6.  The evaluation noted that J.C. used both American Sign Language ["ASL"] and spoken English for short phrases.  H.O. at 4; S-6 at 13.  The evaluation also noted that J.C.'s learning was negatively impacted by behaviors such as elopement, throwing objects, physical aggression toward others, and tantrums.  H.O. at 5; S-6 at 10-22.  The report recommended that J.C. be placed in a highly structured setting with a low student to teacher ratio; a consistent routine with limited transitions; access to signs when he is not utilizing his equipment; and frequent breaks.  H.O. at 5; S-6 at 25. The report additionally recommended that J.C.'s day should be structured around helping J.C. self-regulate as he develops his language. S-6 at 25.  The report noted that J.C. needs to wear his implants to participate in everyday routines and activities, and that he needs access to sign language to help develop his receptive and expressive language skills.  S-6 at 25.

In June 2019, the DCIU completed a communication plan, Individualized Education Plan ["IEP"], and Notice of Recommended Educational Placement ["NOREP"] for J.C.  H.O. at 5-6; S-14; S-15; S-16.  Among other services, the DCIU provided a personal care assistant ["PCA"]

fluent in ASL.  H.O. at 5; S-15 at 41.  The communication plan outlined a total communication approach for J.C. that would include verbal language, ASL, and visuals.  H.O. at 6; S-14 at 1-3.

**B.  The 2019-20 school year**

J.C.'s parent ["Parent"] registered J.C. with the Upper Darby School District in March 2019.  H.O. at 7; S-7; S-86.  Rather than reevaluate J.C. then, the School District tentatively accepted the earlier DCIU evaluation and placed J.C. in a diagnostic placement in the Marple Education Center.  H.O. at 5, 7, 25, 27-28; S-17 at 7; S-23 at 2; N.T. at 38, 76, 381-82.  The School District planned to reevaluate J.C. in the fall of 2019 after observing J.C. in the school-age environment.  *Id.*

The District met with Parent twice over the summer.  H.O. at 7-8.  The first meeting took place on July 29, 2019, to discuss how the student was progressing and the services that he was receiving.  S-17 at 7; N.T. at 64.  The second meeting, which was held to "create a school-age IEP" for Student, took place on August 23, 2019.  H.O. at 7; S-17 at 7, 13; N.T. at 65-67.  At the meeting, Student's parent expressed concerns about transportation to and from the placement.  H.O. at 7; S-17 at 13; N.T. at 66.

The Upper Darby School District and DCIU developed a new IEP for J.C. in August 2019, which was for full time special education.  H.O. at 7-8; S-17 at 44-45.  The IEP's program modifications and items of specially designed instruction included support for transitions, duration of task demands, behavior strategies, sensory needs, instruction using spoken English and ASL, chunking of instruction, simple language, hearing support, visual cues, and checks for comprehension.  H.O. at 7-8; S-17 at 37-40.  The IEP included related services for hearing support, speech and language therapy, occupational therapy, audiology services, a PCA who would be taught basic signs, behavior specialist services, and curb-to-curb transportation (though not

4

transportation from J.C.'s day care center).[3]   H.O. at 8; S-17 at 41-45.   The IEP included a communication plan focused on spoken language supplemented with ASL, and the plan specified that J.C.'s PCA would use ASL as needed.   H.O. at 8; S-18.

The School District concluded that J.C.'s needs could not be met in a regular half day program and required J.C. to be placed in the out-of-district DCIU program at the Marple Education Center, though this conclusion was made with little discussion at the August 2019 IEP meeting.   H.O. at 8; N.T. at 108-09.   Parent did not approve of the accompanying NOREP, which was for full time autistic and deaf/hard of hearing support, claiming that she had concerns about the placement, including transportation, that she had not been given enough time to review the forms, and that she felt bullied into signing them.   H.O. at 9; S-25.

During the school year, J.C. was in an autistic support classroom at the Marple Education Center with a special education teacher and two teaching assistants.   He had between five and seven classmates, some of whom were verbal and some of whom were not.   H.O. at 9; N.T. at 128-29, 135-36, 158, 185, 201-03, 416.   Students in this program received intensive behavioral support and individualized instruction based on their needs.   H.O. at 9; N.T. at 308-09.   In addition to his classroom, the program provided J.C. with access to clubs and other activities through which J.C. could engage with students with the same or higher functioning in social development, emotional development, communication, and academics.   N.T. at 202-03.

---

[3] The related services provided for in the August 2019 IEP were less than those provided for in the June IEP in several ways.   The June IEP specified that J.C.'s PCA would be fluent in ASL and transport J.C. to and from his placement, S-15 at 41-42, whereas the August IEP did not, S-17, though the August IEP did specify that J.C.'s PCA would be able to access and use signs.   S-17 at 23, 42; S-18 at 2.   The June IEP also required speech therapy three times each week (one group session for 30 minutes, and two individual sessions), S-15 at 41-42, whereas the August IEP only required speech therapy two times per week and did not specify whether the sessions were to be group or individual.   S-17 at 41.

J.C.'s program focused on his language needs and need for structure and a consistent routine. H.O. at 10; N.T. at 154-55, 201-04. J.C.'s autistic support teacher used spoken language as the primary form of communication, followed by pictures and ASL. H.O. at 10; N.T. at 190-92. J.C. verbalized single words and some two-word phrases, occasionally used pictures and gestures to communicate, and used a very basic level of ASL. H.O. at 10; N.T. at 207, 471, 514-15, 519-20, 523, 534-36, 555-56, 685, 704-05. J.C.'s hearing support teacher worked with him on ASL individually each week and consulted with J.C.'s other teachers and DCIU staff so that they had access to the same ASL vocabulary and concepts. H.O. at 10-11; N.T. at 151-52, 155, 180-81, 455-56, 465, 483. During this time, J.C. did not always have his cochlear implant processors, and the DCIU would provide substitute equipment as needed. H.O. at 11; N.T. at 188, 199-200, 209-10, 212, 623-24, 650-51; S-6 at 7. Technology to enhance J.C.'s ability to receive targeted audio signals through his cochlear implants was not recommended. H.O. at 11; N.T. at 633-39, 669-72.

During this time, J.C.'s behaviors that required attention from teachers and support staff included noncompliance with directives, elopement, aggression in the form of hitting students and adults, and resistance to transitions. H.O. at 11; N.T. at 188-89, 227-29, 238-40; S-65; S-66; S-67; S-68. A behavioral specialist regularly consulted with J.C.'s autistic support teacher and PCA to assist in behavioral support. H.O. at 11; N.T. at 168-70, 221, 239, 760-70.

J.C. was frequently absent during the school year, primarily because the school district did not provide transportation from J.C.'s day care center to the Marple Education Center. H.O. at 11; N.T. at 144-45, 162, 193, 203, 401-02, 880-81; S-48; S-57 at 7; S-58 at 46-47; S-60; S-61; S-69 at 2; S-75 at 8. These absences negatively impacted J.C.'s need for structure and a consistent routine and led to some skill regression. H.O. 12; N.T. at 200-01, 203-04, 517-18, 575. These absences

also contributed to J.C. not having a consistent PCA until approximately January 2020.  Until January, individuals familiar with J.C. from early intervention were typically assigned as J.C.'s substitute PCA when he attended school, and it would occasionally take some time in the morning to assign a substitute PCA upon J.C.'s arrival.[4]  H.O. at 12; N.T. at 145-47, 173, 218-20, 423-24.

The School District sought and received Parent's written consent to conduct an individual evaluation of J.C. in October 2019, which was to consist of an assessment of cognitive and adaptive skills, behavior observations and/or rating scales, speech and language skills, and gross and fine motor skills.  H.O. at 9; S-45.  In the following months, the School District conducted assessments and gathered data including: a cognitive assessment through the Primary Test of Nonverbal Intelligence – Second Edition; an adaptive functioning assessment through Vineland Adaptive Behavior Scales – Third Edition; a behavioral assessment through the Behavior Assessment System for Children – Third Edition; an executive functioning assessment based on teacher rating scales; an autism spectrum disorder assessment through the Gilliam Autism Rating Scale – Third Edition; a receptive vocabulary assessment through the Peabody Picture Vocabulary Test – 4; a descriptive speech/language formal assessment that did not contain reported scores because the assessment was not administered under standardized conditions; an occupational therapy assessment based on observational input; a physical therapy functioning assessment; observations of J.C. by the school psychologist during two therapy sessions and during transitions; and teacher input based on classroom observations.  H.O. at 13-14; N.T. at 286-87; S-69.

Based on this information, the School District completed an Evaluation Report ["ER"] in December 2019.  H.O. at 13; S-69.  J.C.'s cognitive assessment yielded a score in the average range, though that score did not factor in adaptive functioning.  H.O. at 13; S-69 at 29-30; N.T. at

---

[4] Also starting in January, J.C. had a PCA for his bus ride to and from school. H.O. at 12; N.T. at 386-87, 389, 846.

291-92, 294-95, 306.   The adaptive functioning assessment showed weaknesses across most domains, except for interpersonal relationships and gross and fine motor skills.  H.O. at 13; S-69 at 30-33.  The behavioral assessment showed clinically significant concerns regarding aggression and adaptability, along with at-risk concerns regarding hyperactivity, study skills, and functional communication.  H.O. at 13; S-69 at 33-34.  The executive functioning assessment showed particular weaknesses in the areas of problem solving, behavioral control, and emotional control.  H.O. at 13; S-69 at 34.  The autism spectrum disorder assessment suggested that while J.C.'s emotional response behavior was very similar to that of a student with autism, his rating in the five other assessed categories was not similar.  H.O. at 13-14; S-69 at 34-35.  The assessment included the conclusion that J.C.'s behavior could better be explained by his lack of self-regulation, emotional control, and executive functioning, rather than by a diagnosis of autism spectrum disorder.  *Id*.  The assessment also showed that J.C. required substantial support in the school setting.  *Id*.

The ER found that J.C. was eligible for the primary diagnosis of Hearing Impairment including deafness, and the secondary classification of Other Health Impairment based on an observed lack of behavioral control, struggles with focusing his attention, and excessive periods of emotional lability.  S-69 at 44.  Taking into account the above findings, the ER concluded that J.C. needed full-time consistent use of amplification and access to continual language-rich opportunities to become a successful learner and for speech and language to develop.  *Id*.

Also in December 2019, a new IEP was drafted based on the December ER, which recommended full-time special education support with an adapted curriculum that is individualized, highly flexible and structured, and delivered in a small class size with intensive staff to student ratio, along with one-on-one assistance and behavior support from a professional

and para-professional staff.  H.O. at 15; S-71 at 41.  The IEP identified the following educational needs: functional communication skills and increased words used in utterances, transitioning, gross motor skills, fine motor skills, hearing services in the form of increased self-advocacy, development of understanding of directional and positional concepts, early literacy and mathematics skills, and maintaining attention to tasks.  H.O. at 15; S-71 at 41-43.  Goals for J.C. included increased communication through spoken utterances and ASL, functional literacy, reading comprehension, functional mathematics, gross motor skills, fine motor skills, hearing support, and behavioral support.  H.O. at 15-16; S-71 at 54-71.  The IEP provided for hearing support, consistent and meaningful communication, practice with early literacy and mathematics skills, chunking of information, errorless teaching, physical and occupational therapy supports, and behavioral supports.  H.O. at 16; S-71 at 78-83.  It also included related services for hearing support, speech and language support, physical therapy, occupational therapy, audiology services, a PCA, Board Certified Behavior Analyst services, and curb to curb transportation with a PCA. S-71 at 83-86.  The communication plan for J.C. was updated in the December IEP and continued to specify that J.C. would communicate through spoken language supplemented by ASL and visual supports.  H.O. at 16; S-72.

J.C.'s IEP team, which included Parent, met in January 2020 to discuss the December ER and IEP.  H.O. at 15-16; S-73 at 5.  Following this meeting, the IEP was revised to add items related to J.C.'s attendance and the collection of data pertaining to J.C.'s use of his cochlear implants.  H.O. at 16; S-75 at 81.  On January 15, the School District finalized J.C.'s NOREP, which was for full time autistic support at the Marple Education Center.  H.O. at 16; S-76 at 2. The NOREP included the explanation that the placement was chosen because "it provides the appropriate level of intervention considering [J.C.'s] age, the services required by the IEP and the

type and intensity of [J.C.'s] academic, hearing, and behavioral needs.  It represents the least restrictive environment in which [J.C.'s] needs can be met at this time." S-76 at 2.  Parent provided signed consent for this placement.  H.O. at 16; S-76 at 3-4.

While J.C. made little progress toward his IEP goals in the first quarter of the academic year, he showed significant improvements in attention to group tasks, successful transitions, and use of the cochlear implants during the second quarter.  H.O. at 12.  Then, starting in March 2020, schools—including the Marple Education Center—experienced shutdowns due to the spread of COVID-19.  H.O. at 17; N.T. at 193, 232-233.  In mid-April, the DCIU initiated its distance learning and began sending progress reports to students' homes.  H.O. at 17; N.T. at 236-237; S-94; S-95.  The DCIU provided a tablet to support the virtual instruction of J.C. N.T. at 233-234. When Parent reported difficulty with the tablet, J.C.'s autistic support teacher and speech/language pathologist directly provided Parent with materials at her home.  H.O. at 17; N.T. at 233-234.

### C.  Due process hearing

In September 2019, J.C.'s parent filed a Due Process Complaint against the School District challenging the program offered and provided to J.C.  An Amended Complaint was thereafter filed asserting claims under the IDEA, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act (ADA).

The matter proceeded to a due process hearing.  The Parent sought to establish that the School District's program amounted to a denial of a FAPE in the LRE, and that it lacked adequate planning for Student's transition to kindergarten as well as necessary transportation.  Parent proffered three less restrictive placement options for J.C.: 1) itinerant hearing support services from the Clarke School for Hearing & Speech; 2) hearing services provided in J.C.'s DCIU home school; and 3) the DCIU deaf and hard of hearing school age program at the Wallingford-

10

Swarthmore School District.  Parent's Closing Memo of Law and Findings of Fact Before the Hearing Officer at 9.  As remedies, Parent sought compensatory education and an order for a meeting of Student's IEP team.  The School District maintained that its special education program, as offered and implemented, was appropriate for Student and that no relief was due.

In the Final Decision and Order that is the subject of this appeal, the Hearing Officer concluded that the School District failed adequately to consider whether the Marple Education Center where J.C. was in fact placed was the LRE, which she characterized as a "fatal procedural flaw," H.O. at 28, but nonetheless found that the School District did not deny J.C. a FAPE nor substantively violate the IDEA.  H.O. at 30.  The Hearing Officer also concluded that the School District did not discriminate against J.C. under Section 504 of the Rehabilitation Act or the Americans with Disabilities Act.  H.O. at 30.  The Hearing Officer thus denied the request for compensatory education.  H.O. at 30.  Noting, however, that J.C.'s needs must have changed since the start of the 2019-20 school year, the Hearing Officer ordered the IEP team to reconvene prior to the start of the 2020-21 school year to consider revisions to Student's program and placement. H.O. at 30-32.

### D.  Post-hearing developments

On July 24, 2020, the School District and Parent held a revision IEP meeting to discuss potential changes to J.C.'s IEP.  S.R. at 161, 171-172.  In a July 25 email to the School District's counsel, Plaintiffs' counsel claimed that the parties did not reach agreement on programming and that discussion of placement for J.C. was not completed during that meeting.  S.R. at 20-21.  The School District's counsel responded that its client believed that it satisfied its obligations under the Hearing Officer's Order.  S.R. at 18.  The IEP team then held a second meeting on September 3, 2020.  S.R. at 161, 171-172.  On September 23, 2020, the School District provided Parent with an

updated IEP and NOREP based on the discussion at the two meetings.  S.R. at 153-286.  The School District did not change J.C.'s placement at the Marple Education Center.  S.R. at 153-156.

## II.    Standard of Review

District courts apply a "modified de novo standard of review" when considering an appeal from a Hearing Officer's decision under the IDEA.  *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (internal quotation marks and citation omitted).  Courts cannot "impos[e] their own view of preferable educational methods on the states," and therefore must afford "due weight" to the Hearing Officer's findings in the administrative due process hearing.  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).  "Due weight" means that "[f]actual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why."  *Id.* (internal quotation marks and citation omitted); *accord P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734-735 (3d Cir. 2009).  Furthermore, I must accept the Hearing Officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion."  *D.S.*, 602 F.3d at 564 (internal citations omitted).  "As for conclusions of law, the review is plenary."  *Rose Tree Media Sch. Dist. v. M.J. by & through M.J.*, No. 18-CV-1063, 2019 WL 1062487, at *3 (E.D. Pa. Mar. 6, 2019).  Significantly, the Third Circuit Court of Appeals has held that, in reviewing IDEA appeals, district courts "must decide independently whether the requirements of the IDEA are met."  *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995) (internal quotation marks and citation omitted).

Under the IDEA, "the party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012) (citation omitted).[5]

## III.   Discussion

Plaintiffs argue both that the Upper Darby School District did not provide J.C. with a FAPE and that the Marple Education Center was not the LRE.  I will address both arguments in turn.

### A.   The Upper Darby School District provided a FAPE to J.C.

The IDEA requires states to provide a FAPE to all children with disabilities.  20 U.S.C. § 1412(a)(1)(A).  The statute defines a FAPE as:

> special education and related services that—
> (A)   have been provided at public expense, under public supervision and direction, and without charge;
> (B)   meet the standards of the State educational agency;
> (C)   include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D)   are provided in conformity with the individualized education program [IEP] required under section 1414(d).

20 U.S.C. § 1401(9).  The IEP requirement, in turn, is the "centerpiece" of the IDEA's "education delivery system":

> A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures.  These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances.

---

[5] Plaintiffs cite *Oberti v. Board of Educ.*, 995 F.2d 1204, 1219 (3d Cir. 1993), to claim that "the District bears the burden of proving compliance with the IDEA's mainstreaming requirement." Pls.' Mem. in Supp. of their Mot. for J. on the Admin. R. at 14-15.  This is no longer good law.  *See Ridley Sch. Dist.*, 680 F.3d at 270; *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief"); *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 392 (3d Cir. 2006) ("Appellants would also have us limit the holding in *Schaffer* to the FAPE aspect of the analysis.  Although, to be sure, the facts in *Schaffer* implicated only the FAPE analysis, the Supreme Court made it quite clear that its holding applied to the appropriateness of the IEP as a whole," including "the LRE [or mainstreaming] analysis.").

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 137 S. Ct. 988, 994 (2017) (internal citations removed).   Determining whether a student received a FAPE thus frequently turns on the substantive and procedural adequacy of the relevant IEP(s).   *Id.* at S. Ct. 994-1002.

In the Third Circuit, "[w]hen parents challenge a school's provision of a FAPE to a child, a reviewing court must (1) consider whether the school district complied with IDEA's procedural requirements and (2) determine whether the educational program was 'reasonably calculated to enable the child to receive educational benefits.'"   *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 249 (3d Cir. 2009).

Plaintiffs in this case challenge Upper Darby's provision of a FAPE on both substantive and procedural grounds.   I will begin with Plaintiffs' claim that the FAPE requirement was substantively violated by failing to enable J.C. to receive educational benefits.

### 1.   *Substantive challenges to the School District's provision of a FAPE*

At its core, the IDEA's FAPE requirement mandates that an IEP "be 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.'"   *Mary T.*, 575 F.3d at 240 (quoting *Shore Reg'l High Sch. Bd. of Ed. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004)).   Furthermore, the IEP must "'tailor[]'" the student's education "'to the unique needs' of a particular child."   *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 1000 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181 (1982)).   It is not enough for the educational benefits the child receives to be "merely more than de minimis."   *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 1001.   At the same time, "the state is not required to 'maximize the potential'" of each child.   *T.R. v. Kingwood Twp. Bd. of*

14

*Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (quoting *Rowley*, 458 U.S. at 189, 102 S. Ct. at 3042).

Under this standard, I conclude that Upper Darby provided J.C. with a FAPE.

Plaintiffs take issue with certain aspects of the education provided to J.C., but I agree with the Hearing Officer that the IEP was reasonably calculated to enable J.C. to receive meaningful educational benefits in light of J.C.'s intellectual potential.  The Hearing Officer found that J.C. "needed a consistent routine, limited transitions, a low teacher to student ratio, behavioral support, and development of pre-academic skills and functional communication, as well as a variety of related services," "[e]ach of [which] were appropriately addressed during the 2019-20 school year in the program that was implemented."  H.O. at 28.  After reviewing the record, I likewise conclude that the education provided J.C.—including placement at the Marple Education Center and related services—was reasonably calculated to foster J.C.'s academic growth in light of his need for behavioral support.[6]

Plaintiffs' Amended Complaint lists eight reasons why J.C.'s IEP was not substantively appropriate:

    a.  Student did not consistently have a PCA [personal care assistant].
    b.  The PCAs the District provided did not know ASL.
    c.  Student's teacher did not know ASL.
    d.  The communication plan—required for every deaf student—was not appropriately considered and not implemented.
    e.  Speech/language support was insufficient.
    f.  The District did not ensure that the external components of Student's cochlear implants were functioning properly every day.
    g.  The District did not provide counseling and training for Parent.
    h.  The District's (sic) failed to provide transportation to/from Student's daycare.

---

[6] *See, etc.,* S-69 at 44 ("Furthermore, his observed lack of behavioral control, struggles with focusing his attention, and his excessive periods of emotional l[a]bility meets eligibility for a secondary classification of Other Health Impairment."); S-6 at 25 (identifying, among other recommendations, a small teacher to student ratio, a highly structured classroom, a classroom with fewer transitions and opportunities for changes, and a daily structure centered on helping J.C. self-regulate as he is developing his language).

Amended Comp. at 8.  Plaintiffs have not met their burden in showing that any of these factors

support the conclusion that the IEP was not reasonably calculated to enable J.C. to receive

meaningful educational benefits.

Regarding the first issue—the lack of a consistent PCA—the August 2019 IEP provided

"a PCA who would be taught basic signs," as was discussed in the August IEP meeting, and the

December 2019 IEP likewise provided a PCA to provide sign language support.  H.O. at 8, 16; S-

17 at 23, 41-42; S-71 at 85-86.  The Hearing Officer found that

> Student did not have a consistent PCA until approximately January of the 2019-20
> school year in part because of Student's attendance.  Individuals familiar to Student
> from early intervention typically served as PCAs prior to that time, but sometimes
> one was not available for the entire school day. . . A PCA for the bus was in place
> as of January 2020.

H.O. at 12.  From reviewing testimony from the hearing, I conclude that there were some days

when there was a delay in assigning a PCA, so there was a lack of coverage for the full day.  N.T.

at 145-47, 173, 218-20, 423-24.  But even assuming that there was periodic inconsistency in

providing a PCA to J.C., nothing in the record convinces me that this prevented J.C. from receiving

meaningful educational benefits considering the individualized support he received through his

autistic support teacher and teaching assistants.

The next five concerns raised by Plaintiffs all relate to Upper Darby's provision of

communication support and instruction, whether through ASL instruction, monitoring of J.C.'s

cochlear implants, or other aspects of the total communication plan.  When assessing these issues,

it is important to bear in mind that, going into the 2019-20 school year, "Student had a very limited

ASL vocabulary and was using spoken English more frequently than signs."  H.O. at 6 (citing S-

69 at 12-13).[7]  During the school year, J.C.:

---

[7] *See also* H.O. at 29 ("[i]f Student relied on and was proficient in ASL, such . . . argument[s] might hold
greater traction," but "Student's sign language repertoire has been quite limited and, during the 2019-20

> used total communication, which includes verbal language, visual and auditory modalities, and sign language. . . Student verbalized single words and occasionally a two-word phrase at school . . . and also used pictures and gestures to communicate. Student was using a very basic level of sign language and it was not used as a primary mode of communication.

H.O. at 10. I am persuaded that Upper Darby provided meaningful educational benefit in helping J.C. progress in ASL. As the Hearing Officer found, a "hearing support teacher worked with Student on ASL individually each week, and consulted with the autistic support teacher and other staff so they had signs for vocabulary and concepts to be used in the curriculum on a weekly basis." H.O. at 10-11 (citing N.T. at 151-52, 155, 180-81, 455-56, 465, 483). Testimonial evidence in the record supports the notion that the School District was "working on developing [J.C.'s] communication in every way . . . includ[ing] supplementing sign language he already knows." N.T. at 534. The IDEA did not require the School District to maximize J.C.'s progress in ASL instead of pursuing more broadly "the total communication approach that everyone, including the Parent, agreed Student needed." H.O. at 29.

Turning to the monitoring of J.C.'s cochlear implants, the Hearing Officer found that the School District was, in fact, seeking to support improvement in J.C.'s use of them:

> One specific aspect of the FBA [functional behavior assessment] that the Parent challenges merits mention. There is evidence that Student at times would remove the processor when exhibiting problematic behavior at school. The District clearly considered Student's behavior and its impact on Student's education, and it was explored for the December 2019 ER [evaluation report]. Then, in January 2020, the team determined that was appropriate to take specific data on Student's use of the device which, by the end of the second quarter, had improved. The fact that this specific data was not sought or obtained for the December 2019 ER does not render that evaluation incomplete or inappropriate.

---

school year, was used as only one prong of the total communication approach that everyone, including the Parent, agreed Student needed.").

H.O. at 26.  Testimonial evidence in the record confirms that staff members were monitoring J.C.'s use of the cochlear implants, *see* N.T. at 523-24, 754, and that the Marple Education Center would provide batteries so that J.C. had access to sound if he arrived with dead batteries.  N.T. at 574.  In light of the testimony and the Hearing Officer's finding, I cannot conclude that the School District failed to adequately monitor the functioning of J.C.'s cochlear implants.

Regarding Plaintiffs' claims that the communication plan was not appropriate and that general speech and language support was insufficient, the Hearing Officer found that "the program offered and implemented for the 2019-20 school year was reasonably calculated to address Student's needs and confer meaningful educational benefit."  H.O. at 29.  Evidence in the record shows that the School District was pursuing a *total* communication plan, as agreed upon by the entire IEP team, including Parent, and that J.C. received weekly ASL instruction in addition to his classroom education.  In light of these facts, Plaintiffs' vague allegations that the communication plan and speech and language support were insufficient are unpersuasive.

Plaintiffs also claim that the School District's programming was not a FAPE because the District did not provide counseling and training to Parent.  A school district "only is responsible for providing parent counseling and training if a child's IEP Team determines that it is necessary for the child to receive FAPE."  71 Fed. Reg. 46573 (2006).  Plaintiffs make no arguments and provide no factual support for the claim that counseling and training was necessary to provide a FAPE in this case, and as a result, I cannot conclude that the failure to provide Parent with counseling and training constitutes a deprivation of FAPE.  In any event, the record shows that DCIU staff did attempt to provide Parent with training, N.T. at 644-45, 721, and that the DCIU and J.C.'s instructors provided Parent with digital and physical materials to assist in J.C.'s education during the COVID-19 closures.  N.T. at 246-250.

Finally, Plaintiffs claim that the programming was not a FAPE because the School District failed to provide transportation to and from Student's daycare, but Plaintiffs appear to have since dropped this argument. *See* Pls.' Reply Brief at 2 ("the District devotes pages to an issue that plaintiffs have not appealed—transportation").

In their Motion, Plaintiffs base their substantive FAPE argument in part on J.C.'s allegedly limited progress in meeting the goals established in the IEP. As a threshold matter, a student's after-the-fact progress is not determinative as to whether an IEP was *reasonably calculated* to support meaningful educational progress. *See Bayonne Bd. of Educ.*, 602 F.3d at 564-65 ("a court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made."). Numerous intervening factors can stand between a sound IEP and actual progress in the classroom, and the Hearing Officer identified several such factors in this case. For example, the Hearing Officer found that "Student was frequently absent during the 2019-20 school year prior to the school closure in March 2020," and that "[a] majority of those [absences] were because Student was not provided transportation from the day care center to the school."[8] H.O. at 11. The Hearing Officer additionally found that "Student's frequent absences impeded Student's need for structure and a consistent routine," and that Student "exhibited some regression in skills after absences." H.O. at 12. Of course, the COVID-19 virus caused further disruption during the school year. The Hearing Officer found that "Student's participation in the District's distance learning including related services following the COVID-19 school closures was limited" despite "the autistic support teacher and the speech/language pathologist provid[ing] materials to the Parent to support Student's needs." H.O.

---

[8] As stated above, Plaintiffs have not appealed the transportation issue. *See* Pl. Reply Brief at 2.

at 17.  I do not list these intervening factors to impute blame to J.C.'s family, only to explain why alleged lack of progress in meeting certain IEP goals may not evidence a faulty IEP or a violation of FAPE.

In any event, the record shows that J.C. *has* made meaningful progress on at least certain educational goals.  While the Hearing Officer found that "Student's progress on IEP goals was very limited and inconsistent during the first quarter of the 2019-20 school year," H.O. at 12, she also found that, despite inconsistent performance:

> behavioral data [during the second quarter of the 2019-20 school year] showed significant improvement in attention to group tasks, successful transitions, and use of the cochlear implants; Student was also removed from the classroom very infrequently over that quarter with overall less frequent problematic behaviors.

H.O. at 12.[9]  Testimonial evidence further shows that J.C. made progress during the school year. A DCIU speech language pathologist explained that, starting in January 2020, "between [J.C.] coming in more consistently and using both Cochlear implants every day, we really did start to see some progress."  N.T. at 724.  J.C.'s teacher also explained that "[w]hen [J.C.] is on a routine and he's following his academics and structured schedules, he's making wonderful progress and then when he's absent, he's losing and takes a little bit longer for him to recoup those skills again." N.T. at 201.  The Hearing Officer correctly noted that, while "the Parent quite understandably was looking for more significant progress over the 2019-20 school year, an aspiration that was challenging to meet with Student's absences, LEAs [local education agencies] are required to program for disabilities in a way that is reasonably calculated to provide meaningful educational benefit, not maximum results."  H.O. at 29.  After conducting an independent review of the record,

---

[9] *See also* H.O. at 30 ("Student was making more than minimal progress on many of the IEP goals as of the end of the second quarter.").

I conclude that Plaintiffs have not met their burden to prove that the IEPs were not reasonably calculated to provide meaningful academic benefit.

### 2.  *Procedural challenges to the School District's provision of a FAPE*

Turning to Plaintiffs' procedural objections, the IDEA provides that procedural violations of the IDEA suffice to negate a FAPE only if the procedural inadequacies:

(I)     impeded the child's right to a free appropriate public education;
(II)    significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
(III)   caused a deprivation of educational benefits.

20 U.S.C. § 1415.  Plaintiffs raise two primary procedural objections to the School District's provision of a FAPE.  First and most significantly, Plaintiffs contend that the School District predetermined Student's placement without adequate parental involvement.  Second, Plaintiffs claim that the District's December 2019 evaluation of J.C. was late and deficient.

Turning to Plaintiffs' first contention, "[p]redetermination of an IEP can be grounds for finding a violation of the IDEA, in particular because predetermination can serve to exclude parents from meaningfully participating in the decision making process."  *D.B. ex rel. H.B. v. Gloucester Twp. Sch. Dist.*, 751 F. Supp. 2d 764, 771 (D.N.J. 2010), *aff'd sub nom. D.B. v. Gloucester Twp. Sch. Dist.*, 489 F. App'x 564 (3d Cir. 2012) (citing *Spielberg v. Henrico Cnty. Pub. Sch.*, 853 F.2d 256, 259 (4th Cir. 1988); *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 857-58 (6th Cir. 2004); *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1036-1037 (3d Cir. 1993)).  The Supreme Court has stated that

> IEP proceedings entitle parents to participate not only in the implementation of IDEA's procedures but also in the substantive formulation of their child's educational program.  Among other things, IDEA requires the IEP Team, which includes the parents as members, to take into account any "concerns" parents have "for enhancing the education of their child" when it formulates the IEP.

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 530 (2007).  The key

question is whether the parent(s) "had an opportunity to participate in the IEP formulation in a

meaningful way."  *Fuhrman*, 993 F.2d at 1036.

The Hearing Officer's reasoned factual findings weigh against a conclusion that the School

District predetermined Student's placement without Parent's involvement.  After reviewing the

record, the Hearing Officer found the following:

> The record establishes that the District undertook preparation for Student's
> transition to school-age programming by holding meetings with the Parent to plan
> for necessary changes.  The team agreed that the IU placement would be diagnostic,
> and it was one with which Student and the Parent had previous experience. . . .
> The evidence is also preponderant, however, that the Parent participated in
> meetings and engaged in regular communication with educational providers
> including the District in developing a program in the summer of 2019 and into the
> 2019-20 school year.  For all of these reasons, this hearing officer cannot conclude
> that the District denied her the opportunity to participate meaningfully in
> educational decisions regarding Student for the 2019-20 school year.

H.O. at 27-28.  And my own review of the record confirms that the School District did not

predetermine Student's placement without adequate parental involvement.

Plaintiffs' predetermination objection rests on two primary points.  First, Plaintiffs contend

that the District came to a definitive conclusion about J.C.'s placement without Parent's input,

citing the rule that "it is essential that the IEP is created prior to any final placement decisions."

*D.B. ex rel. H.B.*, 751 F. Supp. 2d at 771.  Here, the IEP *was* created prior to any final placement

decisions or definitive conclusions regarding placement.  While the School District had *tentatively*

placed Student in the Marple Education Center prior to the creation of the August IEP, that initial

placement was diagnostic only, and the IEP team continued to discuss other final placement

options.  *See* H.O. at 5, 25, 27-28; S-17 at 7 ("Team concurs with Mr. Fitti's proposal to conduct

a diagnostic placement through DCIU that will continue to inform his instructional and behavioral

needs.").  Resort to a temporary placement may have been less than ideal, but on the record here

does not by itself constitute a deprivation of FAPE, especially considering that the December 2019 evaluation of J.C. confirmed the appropriateness of the diagnostic placement. *Cf. C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 69 (3d Cir. 2010) ("Absent any evidence that C.H. would have suffered an educational loss, we are left only to determine whether the failure to have an IEP in place on the first day of school is, itself, the loss of an educational benefit. While we do not sanction a school district's failure to provide an IEP for even a *de minimis* period, we decline to hold as a matter of law that any specific period of time without an IEP is a denial of a FAPE in the absence of specific evidence of an educational deprivation.").

Second, Plaintiffs contend that Parent felt "pressured/bullied to sign papers" and that she had "questions regarding [Student's] IEP documents." Pls.' Mem. in Supp. of their Mot. for J. on the Admin. R. at 5-6. These claims do not serve as the basis for a FAPE violation in this case. First, I must give proper weight to the Hearing Officer's determination that Parent engaged in regular conversation with the School District in developing the IEP. H.O. at 28. Plaintiff argues that this finding was in error, but testimonial and non-testimonial evidence in the record supports the finding, *see, etc.,* N.T. at 412, 775; S-17 at 7, and the standard of review warrants against making my own credibility determinations that diverge from the Hearing Officer's findings. Second, the Third Circuit has held that a parent's frustration with the IEP process and ultimate disapproval of an IEP is insufficient to prove a deprivation of FAPE when the parent was still meaningfully involved in the IEP process. *See Bayonne Bd. of Educ.*, 602 F.3d at 565-66. Although a parent should never be pressured to consent to an IEP that they do not approve of, Plaintiffs have not met their burden of proof in establishing that the School District placed such untoward pressure on Parent in this case.

Finally, Plaintiffs contend in their Amended Complaint that the District's December 2019 evaluation of J.C., which served to inform the December 2019 IEP, was late and deficient.  In moving for judgment on the administrative record, Plaintiffs argue that "[a]lthough the District agreed to complete J.C.'s evaluation at the beginning of the school year, it did not issue a permission to evaluate until October 2019 and did not complete the evaluation until December 2019."  Pls.' Mem. in Supp. of their Mot. for J. on the Admin. R. at 9.  On this point, the Hearing Officer had concluded that

> [w]hile it is true that the District did not seek the Parent's consent for that evaluation at the very start of the school year when the District became the [local educational agency], the record does not establish that the brief delay was anything more than *de minimis*.  This is particularly so given Student's inconsistent attendance. . . . This hearing officer cannot conclude that the timing of the December 2019 [evaluation] was a prejudicial violation of the IDEA.

H.O. at 25.  I agree with the Hearing Officer's assessment of the record, and do not find that the delayed evaluation prejudiced J.C.  I also agree with the Hearing Officer's determination that the District "compiled and reviewed relevant data" and that "the December 2019 ER and the record as a whole preponderantly establishes that the evaluation was sufficiently comprehensive to identify Student's special education and related service needs in all areas related to suspected disability for purposes of informing the IEP team as required by the IDEA."  H.O. at 26.  I thus conclude that the School District did not deprive J.C. of a FAPE through either substantive or procedural violations of the IDEA.

**B. The Hearing Officer erred in failing to assess whether the LRE requirement was substantively violated, but the record shows that the Marple Education Center where J.C. was placed was the LRE**

In addition to their FAPE arguments, Plaintiffs challenge the Hearing Officer's assessment of whether the School District's LRE (or "mainstreaming") analysis was a substantive violation of the IDEA.  The IDEA requires that:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5).  In *Oberti v. Board of Education*, the Third Circuit adopted a two-part test for determining whether a school district has complied with the IDEA's LRE requirement:

> First, the court must determine whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily.  Second, if the court finds that placement outside of a regular classroom is necessary for the child to benefit educationally, then the court must decide whether the school has mainstreamed the child to the maximum extent appropriate, i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible.

995 F.2d at 1215 (internal citation and quotations omitted).  The *Oberti* test guides determinations as to whether a placement is appropriate under the IDEA.

The Hearing Officer found that the School District procedurally violated the IDEA by failing to consider the *Oberti* analysis when placing J.C. in the Marple Education Center:

> It is, unfortunately, accurate that the District did not begin with consideration of the regular education setting for Student with supplementary aids and services for purposes of an LRE analysis.  The two prongs of the Oberti test were, therefore, never meaningfully considered by the IEP team.  Certainly Student would benefit from exposure to and interaction with typical peers, particularly with respect to communication deficits.  However, with the only option a segregated placement that did not include any typically developing peers, Student has not been included with non-exceptional peers to any extent in the educational environment.  The failure to comply with these critical LRE principles is a fatal procedural flaw.

H.O. at 28.  Nonetheless, the Hearing Officer found that because the School District's programming was responsive to J.C.'s needs, "the procedural failure to comply with LRE obligations did not also constitute a substantive denial of FAPE in this case."  H.O. at 29.  This finding in turn served as the basis for the Hearing Officer's conclusion that "[t]he District did

commit procedural violations of the IDEA with respect to Student's evaluation and programming, but no substantive violations."  H.O. at 30.

This aspect of the Hearing Officer's analysis rested on the erroneous assumption that an LRE violation can only be a substantive violation of the IDEA if it leads to a violation of FAPE. This is not so: the requirement to place a student in the LRE is a separate substantive mandate under the IDEA.  *See, etc., Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995), *amended* (Oct. 24, 1995) ("IDEA also commands the school district officials to construct a program in the least restrictive educational environment appropriate to the needs of the child."); *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 976 (10th Cir. 2004) ("Educating children in the least restrictive environment in which they can receive an appropriate education is one of the IDEA's most important substantive requirements.  Thus, the LRE requirement is a specific statutory mandate.  It is not, as the district court in this case mistakenly believed, a question about educational methodology."); *Lebron v. N. Penn Sch. Dist.*, 769 F. Supp. 2d 788, 796 (E.D. Pa. 2011) (Brody, J.) ("Plaintiffs make three substantive arguments that the IEP violates IDEA: . . . (2) it violates the Act's least restrictive environment ('LRE') requirement"); *D.B. v. Ocean Twp. Bd. of Educ.*, 985 F. Supp. 457, 499 (D.N.J. 1997), *aff'd*, 159 F.3d 1350 (3d Cir. 1998) ("there are both procedural and substantive aspects to the 'dual requirements' of meaningful educational benefit and least restrictive environment under the Act").  It is therefore the case that "whether an education is 'appropriate' for purposes of the FAPE analysis and whether a student has been integrated 'to the maximum extent appropriate' are distinct questions."  *L.E.*, 435 F.3d at 393; *see also T.R.*, 205 F.3d at 575 (affirming a district court's determination that a school district provided a FAPE but vacating the district court's determination that the school district's placement constituted the LRE and remanding for consideration of whether the school district considered

appropriate alternate placements).  The Hearing Officer erred by confusing these independent issues.

Nonetheless, the Hearing Officer's error was harmless because the record demonstrates that the Marple Education Center was in fact the LRE.  Turning to the two-part test established in *Oberti*, I must first determine whether Upper Darby could have satisfactorily educated J.C. in the regular classroom with the use of supplementary aids and services.  Courts assess several factors under this prong of the *Oberti* test: "(1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom." *T.R.*, 205 F.3d at 579 (citing *Oberti*, 995 F.2d at 1215-17).

The record contains little evidence as to steps the school district took to accommodate J.C. in a regular classroom.  But the record is replete with evidence that J.C. would have received minimal educational benefit from regular education during the time period at issue and that impacts on the classroom might have been substantial.  I give due weight to the Hearing Officer's finding that J.C. "would benefit from exposure to and interaction with typical peers." H.O. at 29.  Even still, the record shows that those benefits would have been outweighed by the detrimental impacts of a large class size and lack of structure present in the regular classroom.  In both the August 2019 and January 2020 NOREPs, the School District rejected a potential placement in the regular educational environment with supplementary aids and services, including itinerant autistic support and supplemental autistic support, because J.C.'s needs indicated a more intensive, restrictive, and specialized environment was required.  S-23 at 2; S-76 at 2.  The December IEP, which was based in part on observation of J.C. during the first half of the school year, further explains why

placement in the regular classroom with supplementary aids and services would have been inappropriate:

- **Explain why the supplementary aids or services will or will not enable the student to make progress on the goals and objectives (if applicable) in this IEP in the general education class.**
  [J.C.'s] academic and behavioral needs are at a significant level. Accommodations needed include modified curricular goals, providing alterative ways for [J.C.] to demonstrate learning, test modifications, and instructional adaptations that include materials being presented individually and/or at a slower pace.  For these reasons it would be difficult for [J.C.] to make meaningful progress in the general education class.

- **What benefits are provided in the general education class with supplementary aids and services versus the benefits provided in the special education class?**
  Based on the significant level of [J.C.'s] academic and behavioral needs, modifications to the general education class and services versus (sic) will not allow the student to make meaningful progress in the general education classroom.

- **What potentially beneficial effect and/or harmful effects might be expected on the student with disabilities or the other students in the class, even with supplementary aids and services?**
  [J.C.'s] progress in the general education classroom would be hindered due to his need of a modified curriculum, slower paced (sic) of material presented to him, providing alternative ways for him to demonstrate learning, test modification, and the need to provide a high degree of instructional adaptations.  This significant level of need would limit meaningful academic progress for [J.C.] as well as other students in the classroom.

S-71 at 88.  Given the evidence reviewed above pertaining to J.C.'s need for educational and behavioral support, I find that Plaintiffs have not met their burden of proof in establishing that J.C. would have received sufficient benefit from regular classroom education.

Having concluded that placement outside of a regular classroom was necessary for J.C. to benefit educationally, I will turn to the question of whether Upper Darby has mainstreamed J.C. to the maximum extent appropriate.  I will first review evidence in the record pertaining to whether such a specialized environment as the Marple Education Center was necessary, before turning to Plaintiffs' proffered alternate placements.

The December IEP recognizes that J.C.'s placement would exclude participation with nondisabled peers in the regular education class, extracurricular activities, or other nonacademic activities:

- **To what extent, if any, will the student participate with nondisabled peers in extracurricular activities or other nonacademic activities?**
  Due to [J.C.]'s significant level of need academically and s[o]cially, he will not [participate with] disabled peers but will be educated in a center based program. . . .
- **Explanation of the extent, if any, to which the student will not participate with students without disabilities in the regular education class.**
  [J.C.] will not participate with students without disabilities in the regular education class.

S-71 at 88.  Nonetheless, the record shows that such a specialized environment was necessary for J.C. during the time period at issue.  Testimony from the Board-certified behavior analyst who prepared J.C.'s functional behavior assessment in December 2019 reads as follows:

> I think [J.C.] demonstrates a similar level of both behavioral and language needs as other students in the classroom.  The level of problem behavior that he displays, I would say, requires a setting where not only the PCA is trained in behavior, but there are other staff members who are available to respond. Most of the staff members are trained in crisis intervention and deescalation. And they have a crisis manager in [J.C.'s] classroom. . . .
>
> And another – one of the strategies that we found to be really successful with [J.C.] was moving him to a place that didn't have anything that he could throw to help him deescalate and Marple has those spaces available to him as well.

N.T. at 783.  Given J.C.'s behavioral and language needs at this time, I conclude that such a specialized placement at Marple Education Center was appropriate.

Plaintiffs put forward several allegedly less restrictive placement options—itinerant hearing support services from the Clarke School, hearing services provided in J.C.'s DCIU home school, and the DCIU deaf and hard of hearing school age program at the Wallingford-Swarthmore School District—but fail to establish that those options would have been appropriate for J.C.'s

needs.[10]  These placement options primarily provide hearing and language support, but I find that the record supports the testimony of an audiologist involved in J.C.'s education, who stated that J.C.'s "behaviors appear to trump his hearing loss at this point.  His behavior has impeded his ability to learn language."  N.T. at 668.  Plaintiffs have failed to establish that any of the alternate placement options would have provided J.C. with the behavior support he needed.

Beginning with hearing services provided in J.C.'s DCIU home school, the above analysis under the first prong of the *Oberti* test demonstrates that services provided in J.C.'s home school would have been insufficient to provide meaningful educational benefit in light of his behavioral needs.  Plaintiffs have put forward no evidence that itinerant hearing support services from the Clarke School for Hearing & Speech would have fared any better, nor that a placement at the Clarke School itself would have sufficiently provided for J.C.'s behavioral needs during this timeframe.

Evidence in the record also establishes that the DCIU deaf and hard of hearing school age program at the Wallingford-Swarthmore School District would have been an inappropriate placement for J.C.  The audiologist testified that the Wallingford-Swarthmore School District program would have been inappropriate for J.C. because his "behavioral component [was] above and beyond what [their] program ha[d] the ability to handle or take care of or manage."  N.T. at 667.  The testimony further specified that J.C. "receives a lot of behavior support . . . at [the Marple Education Center].  And that level of support isn't available in [the Wallingford-Swarthmore School District program]."  N.T. at 667-668.  As with the placement options discussed above, Plaintiffs have not met their burden in establishing that the Wallingford-Swarthmore School

---

[10] In addition to the three placement options proffered by Plaintiffs, the August 2019 NOREP also ruled out an out-of-district placement at the Pennsylvania School of the Deaf because J.C. "needs an environment to address his behavior as well as his hearing needs."  S-23 at 2.

District program—or any alternate program—would have been appropriate for J.C. during the relevant timespan.

Outside of proffering these specific alternate placement options, much of Plaintiffs' LRE argument rests on the fact that J.C. was placed in an autistic support classroom with a population that "overwhelmingly has the most significant cognitive impairments," despite J.C. not being autistic and having an average IQ.  Pls.' Mem. in Supp. of their Mot. for J. on the Admin. R. at 2. Plaintiffs elsewhere argue that J.C.'s "academic deficits . . . are surely compounding as he continues to be in an environment overwhelmingly comprised of intellectually disabled peers and without typically developing peers to serve as communication and social models."  Pls.' Reply Mem. in Further Supp. of their Mot. for J. on the Admin. R.  This argument is unconvincing for two reasons.  First, as the Hearing Officer correctly noted, "the IDEA requires programming that is responsive to the child's needs, not based on disability classification."  H.O. at 39.  J.C.'s autism spectrum disorder assessment suggested that the substantial support offered at the Marple Education Center was appropriate, despite J.C.'s behavior not supporting a diagnosis of autism spectrum disorder.  H.O. at 13-14; S-69 at 34-35.  Second, Plaintiffs have not established that J.C. *was* disproportionately educated with students with intellectual disabilities or lower IQs. Testimony from J.C.'s teacher at the Marple Education Center calls into question whether all of J.C.'s classmates were or are diagnosed with autism spectrum disorder, N.T. at 134-148, and the answer to that question would not resolve the question of whether J.C. was placed only with students with intellectual disabilities.[11]

---

[11] Plaintiffs' argument also depends to some extent on the unstated premise that autistic students necessarily have a lower IQ.  There is increasing evidence that such a blanket assumption is unfounded.  *See* Maja Z. Katusic et al., *IQ in Autism Spectrum Disorder: A Population-Based Birth Cohort Study*, PEDIATRICS, Dec. 2021, at 48; Audrey Thurm et al., *State of the Field: Differentiating Intellectual Disability from Autism Spectrum Disorder*, 10 FRONTIERS IN PSYCHIATRY 526 (2019).

I therefore conclude that the Marple Education Center was the appropriate LRE during the timeframe at issue in this case.

### C.   The Upper Darby School District complied with the Hearing Officer's Order

In addition to their arguments under the IDEA, Plaintiffs also claim that the Upper Darby School District failed to comply with the Hearing Officer's July 14, 2020 Order, in which the Hearing Officer directed the District to convene a meeting of Student's IEP team to consider revisions to J.C.'s IEP.  Specifically, the Hearing Officer ordered that:

> Within twenty calendar days of the date of this Order, the District shall convene a meeting of Student's IEP team to consider revisions to Student's IEP.
>
> a.   The IEP team shall consider whether a reevaluation of Student is warranted.  If a reevaluation of Student is determined to be appropriate and the Parent withholds consent to any portion thereof, there shall be no obligation by the District to evaluate Student before the triennial required reevaluation unless agreed by the parties.
> b.   The IEP team shall explicitly review and consider a new communication plan for Student.
> c.   The IEP team shall explicitly review and consider each of the annual goals to determine necessary revision.
> d.   The IEP team shall explicitly review and consider any and all related services, including parent counseling and training, to determine necessary revision.
> e.   Following completion of the review and revision of the IEP, the team shall proceed to determine Student's placement consistent with least restrictive environment mandates and guidance by the Pennsylvania Department of Education.
> f.   If a decision is made for a change in placement, the team shall develop a plan for Student's transition to the new environment.

H.O. at 31-32.  Evidence in the supplemental record shows that the Upper Darby School District adequately complied with this obligation.  First, the School District and Parent held a revision IEP meeting on July 24, 2020 to address the topics outlined in the Hearing Officer's Order.  S.R. at 161, 171-72.  There was disagreement between the parties as to whether this July 24 meeting satisfied the School District's obligation under the Hearing Officer's Order.  In a July 25 email to the School District's counsel, Plaintiffs' counsel claimed that the parties did not reach agreement

on programming and that discussion of placement for J.C. was not completed.  S.R. at 20-21.  In response, the School District's counsel wrote that the District believed that it complied with its duties under the Order by holding a "lengthy meeting where all of the items were discussed."  S.R. at 18.  Upon Parent's request, the IEP team held a follow-up meeting on September 3, 2020.  S.R. at 161, 171-172.  On September 23, 2020, the School District provided Parent with an updated IEP and NOREP based on the discussion at the two meetings, in which the School District refused to change J.C.'s placement at the Marple Education Center.  S.R. at 153-286.

In arguing that the School District did not comply with the Hearing Officer's Order, Plaintiffs primarily take issue with the School District's consideration of allegedly less restrictive placement options for J.C.  Much of Plaintiffs' argument tracks the discussion of alternate placement options reviewed above.  The NOREP and IEP that followed these two meetings explain why J.C. would still be unable to make meaningful progress in a general education class.  S.R. at 155-156, 171-172, 278-281.  At the two meetings, Plaintiffs urged the School District to further consider the DCIU hearing and language program at Wallingford Swarthmore School District, but as discussed above, that placement option did not have the necessary behavioral support for J.C. *Id.*  The School District also explained why itinerant support from the Clarke School would not sufficiently support J.C.'s academic and behavioral needs.[12]  *Id.*  The School District identified in-district placement options that could provide learning support, emotional support, or autistic support, but concluded that "Students (sic) needs indicate a more intensive environment to meet

---

[12] Plaintiffs claim that "[t]here is no basis for the District's understanding that the request was for only itinerant support" from the Clarke School.  Pls.' Mem. in Supp. of their Mot. for J. on the Admin. R. at 13.  But itinerant hearing support services from the Clarke School is the placement option that Plaintiffs put forward during the Due Process Hearing.  Parent's Closing Mem. of Law and Findings of Fact Before the Hearing Officer at 9; *see also* S-70 at 1 ("Parent is requesting that [J.C.] receive programming at the district in a learning support setting. The itinerant hearing support teacher from the DCIU or from the Clark School should come to the district to work with [J.C.] at school 5 days per week.").

all of his comprehensive needs." *Id.* at 155. Plaintiffs argue that J.C.'s progress in his behavioral goals should weigh against a placement based on his behavioral needs, but nothing in the record shows that intensive behavioral support was no longer necessary for J.C. to make further progress. I thus conclude that the School District complied with the Hearing Officer's Order.[13]

### IV.      Remedies

Plaintiffs seek several judicial remedies, including an award of compensatory education, attorneys' fees and costs, and an order directing the convening of an IEP meeting. Because Plaintiffs have not established a deprivation of Student's right to a free appropriate education in the least restrictive environment, the requested relief is not appropriate.

Plaintiffs' request for an order directing the convening of an IEP meeting directly relates to the Hearing Officer's July 2020 Order, in which the Hearing Officer directed the District to convene a meeting of Student's IEP team to consider revisions to Student's IEP. Evidence in the supplemental record shows that the School District satisfied this obligation. I must therefore refrain from granting Plaintiffs' requested relief, but note that this does not alter the School District's obligation to periodically—and at least annually—review J.C.'s IEP to determine whether the annual goals for J.C. are being achieved and to revise the IEP accordingly, nor the obligation to reevaluate J.C. at least every three years. 20 U.S.C. §§ 1414(a)(2)(B), 1414 (d)(4)(A).

### V.      Conclusion

For the reasons set forth above, I hold that the Hearing Officer did not err in concluding that the Upper Darby School District satisfied its obligation to provide J.C. with a FAPE in the LRE. I also hold that the Upper Darby School District complied with the Hearing Officer's Order.

---

[13] After the two IEP team meetings and after receiving the revised NOREP and IEP, Plaintiffs' counsel emailed the School District's counsel about a potential placement in a Philadelphia school with a tuition agreement. S.R. at 11. Since this email was sent after the School District had already complied with the Hearing Officer's Order, it is outside the scope of this case.

Accordingly, I deny Plaintiffs' Motion for Judgment on the Administrative Record. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge
